U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 AUG 28 A 9: 10

CLERK

BY ______
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| LANSANA MANSARAY, Plaintiff, v. U.S. CITIZENSHIP AND IMMIGRATION SERVICES; LAURA B. ZUCHOWSKI, Director, U.S. Citizenship and Immigration Services Vermont Service Center, in her individual and official capacities, Defendants. | ) | Case No. 2:24-cv-1101 |

**OPINION AND ORDER**
**(Docs. 40, 45, 53, 54)**

Plaintiff Lansana Mansaray, representing himself, brings this action against the United States Citizenship and Immigration Services ("USCIS") and Laura B. Zuchowski, the Director of USCIS's Vermont Service Center, challenging USCIS's denial of Mr. Mansaray's Violence Against Women Act ("VAWA") self-petition. He argues that the denial violated his right to due process under the Fifth Amendment and was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq. Mr. Mansaray seeks declaratory relief and injunctive relief ordering USCIS to reopen and re-adjudicate his VAWA petition. On the Government's motion to dismiss for lack of subject matter jurisdiction, (Doc. 29), the court dismissed certain of Mr. Mansaray's claims, concluding it lacked jurisdiction over them (Doc. 39).

Two of Mr. Mansaray's claims survived this jurisdictional review: (1) his claim that the Government violated the APA and Fifth Amendment's Due Process by considering evidence that he had not had the opportunity to inspect or rebut; and (2) his claim that the Government violated

the APA and Fifth Amendment's Due Process by denying his Form I-360 based on his failure to provide USCIS with a copy of the arrest report connected to his arrest on felony charges of endangering the welfare of children. In the court's order, the court afforded the Government an opportunity to submit a motion to dismiss these claims under Fed. R. Civ. P. 12(b)(6). The Government has now filed that motion (Doc. 45), and the parties have completed their briefing. Also pending are Mr. Mansaray's motion to compel production (Doc. 40), motion to file a surreply (Doc. 53), and motion to strike the Government's reply in support of its motion to dismiss (Doc. 54).

**Factual Background**

The following facts are drawn from the Third Amended Complaint and the documents that the parties have attached to their briefing.

Mr. Mansaray is a native and citizen of Sierra Leone. (Doc. 29-2 at 1.) He first arrived in the United States in 2006 on a B-1 temporary business visitor visa. (*Id.*) When the visa expired, Mr. Mansaray stayed in the U.S. (*Id.*) The Department of Homeland Security ("DHS") served him with a Notice to Appear in immigration court in April 2007 due to his visa overstay. (*Id.*) An immigration judge ordered his removal to Sierra Leone on May 28, 2009 (Doc. 29-3), and the Board of Immigration Appeals ("BIA") affirmed the order on November 24, 2010 (Doc. 29-4). The BIA denied Mr. Mansaray's motion to reopen his immigration proceedings on April 29, 2011. (*Id.*)

DHS did not immediately execute the order of removal, so Mr. Mansaray remained in the United States. In August 2011, he married a U.S. citizen with whom he had two children. (Doc. 29-6 at 1; Doc. 18 at 2–3; Doc. 18-4 at 1.) Mr. Mansaray's spouse became abusive, however, and the relationship ended. (Doc. 29-6 at 1.) On February 21, 2017, on the basis of

that abuse, Mr. Mansaray filed a VAWA self-petition (Doc. 18-1 at 1), a type of petition that a noncitizen can file to obtain legal permanent resident ("LPR") status in the United States if they were abused by their U.S. citizen spouse, 8 U.S.C. § 1154(a)(1)(A)(iii). To be eligible for LPR status as a VAWA self-petitioner, the applicant must demonstrate that they are "a person of good moral character." *Id.* § 1154(a)(1)(A)(iii)(II)(bb).

On April 27, 2017, just two months after Mr. Mansaray filed his VAWA self-petition, DHS deported him to Sierra Leone. (Doc. 18 at 3.) His deportation followed on the heels of his arrest on August 23, 2016, for two counts of Endangering Welfare of Children, a third-degree felony in Pennsylvania. (Doc. 29-5 at 2; Doc. 18-4 at 3; Doc. 18 at 3.) Mr. Mansaray pled guilty to two counts of misdemeanor Endangering Welfare of Children and served a five-month sentence. (Doc. 18-9 at 2; Doc. 18 at 3; Doc. 49-4.) In his plea agreement, Mr. Mansaray admitted that he "instructed [his five- and six-year-old sons] to remove their car seats from the car, and after doing so, . . . drove away and left the children standing by the roadway." (Doc. 49-4.) DHS took custody of Mr. Mansaray upon his release and held him for 95 days before ultimately deporting him. (Doc. 29-6 at 1; Doc. 18 at 3.)

The events underlying his August 2016 arrest became a primary focus in USCIS's evaluation of Mr. Mansaray's VAWA self-petition, particularly with respect to USCIS's determination regarding his good moral character. In August 2018, USCIS sent Mr. Mansaray a Request for Evidence ("RFE") explaining that the evidence Mr. Mansaray had submitted regarding his good moral character was insufficient given his criminal history. (Doc. 18-5.) The RFE also highlighted an order of protection placed on him by a friend, P.K.,[1] and a record in his

[1] The court uses initials to protect the identity of Mr. Mansaray's friend.

administrative filing "indicat[ing] that [he] may have been a person of interest for a sex assault charge on June 27, 2014." (*Id.* at 3.)

As detailed by USCIS, Mr. Mansaray included the following evidence of good moral character in his initial filing:

- A personal statement giving Mr. Mansaray's account of the events leading to his arrest in August 2016;
- A personal statement explaining how Mr. Mansaray became a missionary to many individuals while he was incarcerated;
- An affidavit from P.K. "explain[ing] how [Mr. Mansaray was] trustworthy, dependable, kind, and a wonderful father to [his] children";
- Affidavits from several community members attesting to Mr. Mansaray's honesty, ambition, and active involvement in the church community; and
- A copy of a Pennsylvania State Police Response for Criminal Record Check.

(*Id.* at 2–3.)

Regarding his arrest for child endangerment, Mr. Mansaray's personal statement explained that, on the day in question, Mr. Mansaray and his five- and six-year-old sons were preparing to leave home, and Mr. Mansaray asked his sons to "take their seats." (Doc. 29-6 at 2.) According to Mr. Mansaray, he "meant for them to be seated in the car and buckled up." (*Id.*) The children allegedly misunderstood the request because, although Mr. Mansaray had a car, P.K. regularly allowed him to use her car when he took longer trips because it had better gas mileage. Believing they would be traveling in P.K.'s car, Mr. Mansaray's sons removed their car seats from Mr. Mansaray's car, walked to the spot where P.K. usually dropped off her car, and stood there waiting. (*Id.*) In the meantime, Mr. Mansaray got in his car and drove away without

checking if his children were in the back seat. When he realized his sons were not there, he rushed home, only to be arrested for child endangerment. (*Id.*)

In the RFE, USCIS explained that Mr. Mansaray's personal statement and his other evidence of good moral character were insufficient to meet his burden of proof given the serious nature of his charges, his guilty plea, and his five-month incarceration. USCIS stated that the letters of support Mr. Mansaray submitted described his positive attributes and contributions to his community but "d[id] not provide sufficient details of [his] criminality" and therefore "h[e]ld little evidentiary weight." (Doc. 18-5 at 3.) USCIS also faulted Mr. Mansaray for failing to submit copies of arrest reports, court documents showing the final disposition of any possible charges related to the protection order and allegation of sexual assault, or "relevant excerpts of law for th[e] jurisdiction showing the maximum possible penalty for possible charges." (*Id.*)

The RFE closed by providing Mr. Mansaray with the following instructions:

> Submit evidence of your good moral character. Evidence of good moral character is your own affidavit attesting to your good moral character and criminal history, if any.
>
> - Your affidavit should be supported by criminal history clearances or records from each place you resided for at least six months during the 3-year period before filing your Form I-360 [VAWA self-petition]. If you have resided outside the United States during this 3-year period, you should submit criminal clearances from those locations. . . .
>
> - If criminal history records, police clearances, or similar reports are not available for some or all locations, you should submit an explanation for why they are not available and other evidence to support your affidavit. Such evidence may include affidavits from responsible persons who can knowledgeably attest to your good moral character.
>
> If you have been arrested or charged with any crime, please submit the following:
>
> 1. Copies of arrest report(s);
> 2. Certified copies of court documents showing final disposition of the charge(s); and

3. Relevant excerpts of law for that jurisdiction showing the maximum possible penalty for each charge.

In addition to the evidence requested above, you may also choose to submit any other evidence of positive factors you want USCIS to consider in determining whether you are a person of good moral character:

Evidence of positive factors may include:

1. Employment and payment of taxes.
2. Community involvement and/or service.
3. Any evidence of rehabilitation from any negative factors set forth in your case.

(*Id.* at 3–4.)

In response to the RFE, Mr. Mansaray submitted the following:

- Multiple personal statements;
- Court orders from Venango County, Pennsylvania;
- A Final Protection from Abuse Order from P.K.;
- His plea agreement on the August 2016 child endangerment charges;
- A Pennsylvania Commission Sentencing Guidelines Form; and
- A Pennsylvania State Police Response for Criminal Record Check.

(Doc. 29-7 at 2.) Mr. Mansaray's personal statements discussed, among other topics, detailed versions of his events precipitating (1) his 2016 conviction; (2) the order of protection; and (3) the 2014 complaint of sexual assault. (*See* Doc. 45-2.) In addressing the complaint of sexual assault, Mr. Mansaray explained that he had been aware of the allegation, identified the complainant as a woman with whom he had a close personal relationship, denied the factual substance of the complaint, and explained that the complainant had allegedly fabricated the assault to "get . . . revenge" on Mr. Mansaray because she was jealous of his relationship with

another woman and because Mr. Mansaray had discovered that the complainant was stealing from him when she babysat his children. (*Id.* at 8–9.)

Determining that this evidence was insufficient, USCIS issued Mr. Mansaray a Notice of Intent to Deny ("NOID") on October 25, 2019, giving Mr. Mansaray a final opportunity to submit additional evidence. (Doc. 29-7.)

As with the RFE, the NOID explained the deficiencies with Mr. Mansaray's evidence. First, USCIS acknowledged that Mr. Mansaray's personal statement discussed the events leading up to the child endangerment charge, the circumstances of the protection order from P.K., and how the sexual assault charge occurred. (*Id.* at 2.) USCIS concluded that the statement gave "some evidentiary weight" toward the good moral character standard but, by itself, "d[id] not establish [Mr. Mansaray's] good moral character." (*Id.*) The NOID also acknowledged the other evidence Mr. Mansaray submitted but deemed it insufficient because he "did not submit copies of arrest report(s)." (*Id.*) The NOID concluded by providing the same instructions as the RFE regarding additional evidence that Mr. Mansaray should submit. (*Id.* at 3.) It also informed Mr. Mansaray that, if he was "unable to submit the documentation requested by USCIS" he should "submit a statement explaining why this documentation [was] unavailable to [him]." (*Id.* at 4.)

In response to the NOID, Mr. Mansaray submitted a personal statement; a request to the Oil City Police Department to release an arrest report; an affidavit from a coworker; and Bible leadership certificates and a diploma from the Word of Faith church. (Doc. 18-4 at 7.) In his personal statement, Mr. Mansaray explained that he tried to request his arrest report from the Oil City Police Department when USCIS issued the RFE but could not get it because he was required to go in person—an impossibility given his deportation from the U.S. (*Id.*) The statement also explained that, when he received the NOID, Mr. Mansaray sent a fax to the Oil

City Police Chief requesting a release of his arrest report but that the request was denied." (*Id.*) Finally, he stated that, since his last arrest, he had not been convicted of any crime that would render him inadmissible or deportable, that the child endangerment charges "brought against [him] were as a result of the plethora and negativity in peoples lives," and that Mr. Mansaray had "worked very hard to support [his] children and make [him]self useful to [his] community." (*Id.*)

On November 19, 2021, USCIS denied Mr. Mansaray's VAWA self-petition. (Doc. 18-4.) Regarding his personal statement, USCIS reasoned that,

> [a]lthough you state that you haven't been convicted of any felony since your last arrest and that you have worked very hard to support your children, the seriousness of the arrests and failure to provide police reports make it unclear as to the specific situation that led to your arrest.

(*Id.* at 7.) USCIS went on to state that, although it acknowledged that he submitted evidence that he requested his arrest report from the Oil City Police Department, that evidence "is insufficient because it does not address the events that led up to all these arrests to help USCIS make a favorable decision regarding your good moral character." (*Id.*) As to the affidavit and leadership certificates, USCIS concluded that those "pieces of evidence are insufficient because they do not provide any information relating to your criminal history." (*Id.*) In conclusion, USCIS explained that the "evidence in its totality" did not demonstrate Mr. Mansaray's good moral character. (*Id.*)

On January 21, 2021, Mr. Mansaray submitted a Motion to Reconsider with USCIS. (Doc. 29-8.) USCIS denied the motion (Doc. 29-9), as well as Mr. Mansaray's subsequent Motion to Reconsider the denial of his *first* Motion to Reconsider (Doc. 29-10). This lawsuit followed.

## **Legal Standard**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff "must plead enough facts to state a claim to relief that is plausible on its face." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 78 (2d Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). In evaluating a Rule 12(b)(6) motion, the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *Trs. of Upstate N.Y. Eng'rs*, 848 F.3d at 566) (internal quotation marks omitted). "Dismissal is appropriate when 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'" *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019) (alteration in original) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014)).

"In deciding a Rule 12(b)(6) motion, the court may consider, in addition to the factual allegations of the complaint, [certain] documents attached to the complaint as exhibits or incorporated in it by reference, matters of which the court may take judicial notice, and documents in the plaintiff's possession or of which she had knowledge and relied on in bringing suit." *Ru Jun Zhang v. Lynch*, No. 16-CV-4889, 2018 WL 1157756, at *4 (E.D.N.Y. Mar. 1, 2018); *see Roth v. Citi Mortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014). "Thus, when faced with a motion to dismiss in the APA context, a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment." *Wang v. Noem*, 793 F. Supp. 3d 1231, 1235 (C.D. Cal. 2025) (internal quotation marks and citation omitted); *see, e.g.*, *Yu v. U.S. Dep't of Transp.*, 440 F. Supp. 3d 183, 197 n.7 (E.D.N.Y. 2020).

## Analysis

The court begins by addressing Mr. Mansaray's motions to file a surreply (Doc. 53) and to strike the Government's reply brief and attached exhibits (Doc. 54). The court then turns to the motion to dismiss (Doc. 45). The motion to compel (Doc. 40) is currently stayed pending the court's decision on the motion to dismiss.

### I. Motion to File Surreply (Doc. 53)

District courts "have discretion to decide whether to strike or permit a litigant's sur-reply." *Bradshaw v. Piccolo*, 772 F. Supp. 3d 331, 341 (W.D.N.Y. 2025) (quoting *Neary v. Weichert*, 489 F. Supp. 3d 55, 62 (E.D.N.Y. 2020)). Mr. Mansaray in this case seeks leave to file a surreply because of new evidence and arguments that the Government included in its reply brief, albeit in response to arguments that Mr. Mansaray made in his response. The court concludes that Mr. Mansaray should have the opportunity to respond to the Government's arguments and evidence, as set forth in the reply brief. The court therefore GRANTS the motion to file a surreply. (Doc. 53.) The court has considered the proposed surreply filed as Doc. 53-1.

### II. Motion to Strike Reply (Doc. 54)

Mr. Mansaray has filed a motion to strike the Government's reply as untimely. Mr. Mansaray is correct that the reply brief was due on June 15, 2026, and that it was filed one day late on June 16, 2026. (*See* Docs. 48, 49.) It is also true that the Government did not file a motion for an extension of time, either before or after the time for filing the reply had elapsed. *See* Fed. R. Civ. P. 6(b).

Nevertheless, "district courts have broad discretion to enforce deadlines, or to excuse the enforcement of deadlines." *Mascaro Constr. Co. L.P. v. Loc. Union No. 210*, 391 F. App'x 13, 16 (2d Cir. 2010) (summary order). The Government's one-day delay in filing has not

prejudiced Mr. Mansaray, especially "since [Mr. Mansaray] had no further right of reply." *Id.* In any event, the court has also allowed Mr. Mansaray to file a surreply. The motion to strike the reply (Doc. 54) is DENIED.

## III. Motion to Dismiss (Doc. 45)

The Government seeks dismissal of Mr. Mansaray's remaining claims. The court begins with the issue of nondisclosure of evidence.

### A. Alleged Non-Disclosure of Evidence

In his Third Amended Complaint and in his briefing, Mr. Mansaray argues that it violates the APA and due process for USCIS to consider evidence that an applicant has not had the opportunity to inspect and, therefore, meaningfully rebut. (*See* Doc. 18 at 5; Doc. 48 at 9–10.) He therefore alleges that, because USCIS never provided him with the 2014 police report of sexual assault, the denial of his VAWA petition was arbitrary and capricious and a violation of his due process rights. The court begins with Mr. Mansaray's APA claim.

#### 1. APA

Mr. Mansaray's APA claim focuses on whether USCIS complied with 8 C.F.R. § 103.2(b)(16), the regulation governing an immigration applicant's rights to inspect evidence. "[I]t is axiomatic that 'an administrative agency must adhere to its own regulations.'" *Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 437 (E.D.N.Y. 2011) (quoting *Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006)). If USCIS failed to comply with § 103.2(b)(16), and if that failure resulted in actual prejudice to Mr. Mansaray, *see* 5 U.S.C. § 706, its rejection of Mr. Mansaray's VAWA petition would be arbitrary and capricious.

Section 103.2(b)(16) states, in relevant part:

> ***Inspection of evidence.*** An applicant or petitioner shall be permitted to inspect the record of proceeding which constitutes the basis for the decision, except as provided in the following paragraphs.
>
> > **(i)** ***Derogatory information unknown to petitioner or applicant.*** If the decision will be adverse to the applicant or petitioner and is based on derogatory information considered by [USCIS] and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered . . . .
> >
> > **(ii)** ***Determination of statutory eligibility.*** A determination of statutory eligibility shall be based only on information contained in the record of proceeding which is disclosed to the applicant or petitioner, except as provided in paragraph (b)(16)(iv) of this section.

8 C.F.R. § 103.2(b)(16)(i)–(ii). The parties disagree about the meaning of subsections (i) and (ii) and which one applies in this case.

Most cases concerning the right to inspect derogatory information prior to the denial of a visa do not explicitly address which subsection applies—or if both apply. At least two district courts have considered the issue directly and held that § 103.2(b)(16)(i) is the relevant provision in cases like this one, where the plaintiff's claim concerns their opportunity to adequately respond to derogatory information that USCIS is considering. *See Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 21-CV-10083, 2025 WL 1725826, at *7 (D. Mass June 20, 2025) ("Subsection (i)'s requirement that derogatory information unknown to the applicant is provided 'before the decision is rendered' makes the omission of similar language from the introductory clause of 8 C.F.R. § 103.2(b)(16) or its other subsections conspicuous. The absence of such language suggests that, subject to the specific requirements of its subsections, 8 C.F.R. § 103.2(b)(16) does not apply until the decision is made."); *Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1355 (M.D. Fla. 2016) ("A petitioner's right to rebut derogatory information of which he

is unaware derives from subsection (i), not subsection (ii) . . . ."), *aff'd sub nom. Brinklys v. Sec'y, Dep't of Homeland Sec.*, 702 F. App'x 856 (11th Cir. 2017).

In a third case, *Bolukgiray v. USCIS*, --- F. Supp. 3d ----, 2026 WL 2227809 (N.D. Cal. 2026), the court considered the independent effect of subsections (i) and (ii) and concluded that subsection (ii) "provides a consequence for USCIS's violation of the inspection and disclosure requirements." *Id.* at *6. "Specifically, paragraph (ii) requires USCIS to base its determination of statutory eligibility 'only on information contained in the record of proceeding which is disclosed to the petitioner.' 8 C.F.R. § 103.2(b)(16)(ii). Thus, USCIS is prohibited from relying on information that it failed to disclose." *Id.*

Beyond those three cases, many examples exist of courts that have assumed subsection (ii) applies. *See Sehgal v. Lynch*, 813 F.3d 1025 (7th Cir. 2016) ("[The plaintiffs] argue that USCIS violated one of its own regulations by not providing them with a copy of Miller's handwritten letter during the administrative proceedings. The regulation, 8 C.F.R. § 103.2(b)(16)(ii), prohibits the agency from basing a determination of statutory eligibility on information that has not been disclosed to the applicant or petitioner."); *Rosati v. Mayorkas*, 691 F. Supp. 3d 597, 604–05 (N.D.N.Y. 2023) (considering both subsection (i) and (ii) in its analysis of plaintiff's claim for failure to disclose derogatory information); *Naiker v. USCIS*, 352 F. Supp. 3d 1067, 1078 (W.D. Wash. 2018) ("Mr. Naiker was essentially denied an opportunity to rebut the derogatory e-mails, or to argue against their reliability. . . . This would seem to be precisely the situation 8 C.F.R. § 103.2(b)(16)(ii) seeks to avoid."); *Ghafoori v. Napolitano*, 713 F. Supp. 2d 871, 879–80 (N.D. Cal. 2010) (holding that subsection (ii) required disclosure of actual document on which USCIS relied so plaintiff could rebut the information contained therein).

Courts also disagree about what USCIS must disclose under subsections (i) and (ii), the main issue generally being whether USCIS must disclose the underlying documents or evidence. Most courts have held that subsection (i) requires only a summary sufficient for the applicant to rebut the underlying information. *See Koffi v. Holder*, 487 F. App'x 658, 660 (2d Cir. 2012) (summary order) ("With regard to Appellants' argument that the actual documentation bearing the allegations needed to be disclosed, the regulations state that Mr. Koffi need only be 'advised of' the derogatory information in the case of an adverse decision. 8 C.F.R. § 103.2(b)(16)(i). The actual documents are not required to be disclosed."); *see also Mestanek v. Jaddou*, 93 F.4th 164, 174 (4th Cir. 2024); *Zizi v. Field Off. Dir.*, 753 F. App'x 116, 117 (3d Cir. 2019) (summary order); *Mangwiro v. Johnson*, 554 F. App'x 255, 261–62 (5th Cir. 2014) (per curiam) (summary order); *Naiker*, 352 F. Supp. 3d at 1078; *Brinklys*, 175 F. Supp. 3d at 1353; *but see Bolukgiray*, --- F. Supp. 3d ----, 2026 WL 2227809, at *6 (holding that subsection (i) requires USCIS "to disclose the information and the evidence that constitutes the basis for its determination of statutory ineligibility"). As for subsection (ii), the courts are more evenly split on whether the actual evidence must be disclosed. *See, e.g.*, *Naiker*, 352 F. Supp. 3d at 1078 (subsection (ii) requires USCIS to disclose the actual evidence); *Ghafoori*, 713 F. Supp. 2d at 879–80 (same); *Smith v. Garland*, 103 F.4th 1244, 1254–55 (7th Cir. 2024) (subsection (ii) requires only a summary).

The court ultimately need not weigh in on this debate because the pleadings and filings demonstrate that any error was harmless. "Under the prejudicial error rule, a court will not disturb an agency's decision if it determines that the outcome of the agency action would be the same absent agency error." *Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 629 (2d Cir. 2023). Here, the allegedly undisclosed information was the sexual assault complaint from 2014. Mr.

Mansaray's RFE response demonstrates that he was well aware of the contents of that complaint. In that response, he offered a detailed account of his version of the events and identified the complainant by name. (Doc. 45-2 at 9.) He further stated that the police "invited [him] for a meeting and in the meeting they told [him] what [the complainant] said about me." (*Id.*) He therefore knew that the complaint was filed and knew the allegations against him. He used that information to provide a detailed response to the allegations.

Mr. Mansaray does not allege that USCIS's failure to produce the report prejudiced him in any way. Instead, his briefing focuses on the fact that the sexual assault report listed an expired New York driver's license that he was allegedly no longer using at the time of the report.[2] (Doc. 48 at 8–9.) He argues that, if USCIS had produced the report, he could have corrected the inaccurate driver's license. (Doc. 53-1 at 8.) But USCIS did not rely on the driver's license in denying the VAWA petition, and Mr. Mansaray does not explain how it could have prejudiced him. He is not alleging a case of mistaken identity, nor could he plausibly allege one, given his detailed description of his version of the events surrounding the sexual assault complaint.

Because any alleged violation of 8 C.F.R. § 103.2(b)(16) was harmless, Mr. Mansaray's non-disclosure APA claim is DISMISSED.

**2. Due Process**

To evaluate procedural due process claims, courts employ the test announced in *Mathews v. Eldridge*, 424 U.S. 319 (1976). In *Mathews*, the Supreme Court identified three factors that

[2] In his response, Mr. Mansaray stated that he "never held a New York State driver's license." (Doc. 48 at 8.) The Government proceeded to attach evidence of his New York driver's license to its reply brief. (*See* Docs. 49-2, 49-3.) In his surreply, Mr. Mansaray refers to the driver's license as expired.

bear on the constitutional need for procedural protections: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

In this as-applied challenge to USCIS's procedures, the court need not undergo the full *Mathews* analysis. As discussed in relation to the APA claim, Mr. Mansaray cannot demonstrate prejudice. In the *Mathews* framework, that means that there would have been no value in providing "additional or substitute procedural safeguards." No matter how important Mr. Mansaray's interest in living in the United States is, he cannot overcome the fact that production of the sexual assault complaint would not have changed the outcome of his case.

**B. Failure to Produce Police Report as Basis for Denial**

Mr. Mansaray's remaining APA and due process claims concern his allegation that USCIS denied his VAWA application because he failed to provide them with the 2016 police report connected to his conviction for child endangerment. Mr. Mansaray could not provide the report because the police required him to obtain it in person, a physical impossibility given his deportation to Sierra Leone. The Government seeks dismissal of the APA and due process claims, arguing that USCIS denied the VAWA application not because Mr. Mansaray failed to submit the report but because he failed to produce sufficient evidence to carry his burden of proving that he is a person of good moral character. The Government does *not* argue that, if USCIS did in fact deny the petition on the basis of Mr. Mansaray's failure to submit the police

report, that such denial would nevertheless comport with due process and the APA. The court's focus is therefore discerning the basis for USCIS's denial.

In undertaking this analysis, the court is mindful of the deferential standard of review under the APA.

> [S]o long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned.

*Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007); *see also Kakar v. USCIS*, 29 F.4th 129, 132 (2d Cir. 2022) ("A court can thus uphold a decision of less than ideal clarity if the agency's path may reasonably discerned." (internal quotation marks omitted)).

As detailed in the facts section, USCIS placed significant emphasis on Mr. Mansaray's failure to provide the police report related to conviction of child endangerment. The RFE instructed Mr. Mansaray to submit a copy of the police report, and the NOID stated that, because Mr. Mansaray "did not submit copies of arrest report(s) . . . , additional evidence is requested." (Doc. 29-7 at 2.) Similarly, in its denial of Mr. Mansaray's VAWA application, USCIS provided the following analysis of Mr. Mansaray's personal statement:

> Although you state that you haven't been convicted of any felony since your last arrest and that you have worked very hard to support your children, the seriousness of the arrests and failure to provide police reports make it unclear as to the specific situation that led to your arrest.

(Doc. 18-4 at 7.) USCIS went on to state that, although it acknowledged that he submitted evidence that he requested his arrest report from the Oil City Police Department, that evidence "is insufficient because it does not address the events that led up to all these arrests to help USCIS make a favorable decision regarding your good moral character." (*Id.*) As to the

affidavit and leadership certificates, USCIS concluded that those "pieces of evidence are insufficient because they do not provide any information relating to your criminal history." (*Id.*)

In conclusion, USCIS provided the following explanation of its denial:

> After a review of all of the evidence in its totality, USCIS cannot reach a favorable decision. The record does not contain satisfactory evidence to demonstrate your qualification under this requirement because you did not provide your arrest record relating to your criminal charge of Endangering Welfare of Child by two counts (184304A1), and it is unclear to USCIS the events that took place prior to your arrest to help USCIS make a determination that you are a person of good moral character. Further, evidence from your administrative record also indicated that you pled guilty to your charge of Endangering Welfare of Child M1 and [were] sentenced on December 28, 2016, to confinement for not less than five months and not more than 24 months less than one day, a fine of $250 dollars, and one year probation. Your evidence also showed that you were deported from the United States and returned to Sierra Leone on April 25, 2017; however, it did not establish the period of time that you were actually confined prior to your deportation. Therefore, the record does not contain satisfactory evidence to demonstrate your qualification under this requirement.

(*Id.*)

This explanation is "of less than ideal clarity." *Kakar*, 29 F.4th at 132. In particular, the following language gives the impression that USCIS denied Mr. Mansaray's application because he failed to provide the 2016 arrest record: "The record does not contain satisfactory evidence to demonstrate your qualification under this requirement because you did not provide your arrest record relating to your criminal charge of Endangering Welfare of Child by two counts . . . ." (Doc. 18-4 at 7.) Read as a whole, however, the court concludes that USCIS denied Mr. Mansaray's VAWA petition not because of his failure to provide that specific piece of evidence but because of his more general failure to provide evidence of good moral character that related specifically to his criminal history. For instance, when discounting the weight of affidavits of support, USCIS explained that those documents were "insufficient because they do not provide any information relating to your criminal history." (*Id.*) USCIS was therefore suggesting that

personal affidavits that *did* directly speak to Mr. Mansaray's criminal history could have supported a showing of good moral character. USCIS made similar statements about supporting affidavits in the RFE, noting that they did not speak to Mr. Mansaray's alleged criminal conduct. (Doc. 18-5 at 3.)

Further, when USCIS stated that it was denying Mr. Mansaray's application because he "did not provide [his] arrest record," it continued, "and it is unclear to USCIS the events that took place prior to your arrest to help USCIS make a determination that you are a person of good moral character." (Doc. 18-4 at 7.) That language again emphasizes that Mr. Mansaray failed to provide *any* evidence regarding the events that led up to the child endangerment arrest other than his own personal statement. USCIS further relied on the fact that Mr. Mansaray had pled guilty to the charges in denying his application.

Ultimately, it was Mr. Mansaray's burden to prove he was a person of good moral character. There was derogatory information in his file, including criminal records, that he had to rebut to make that showing. He produced neither a police report nor other evidence to shine light on the nature of his conviction, other than his own statements. In USCIS's view, the apparent seriousness of his crime and the other negative information in his file outweighed the evidence of good moral character that Mr. Mansaray did submit. The court is satisfied that USCIS denied the application not because of the failure to file a single police report but because the totality of the positive evidence was insufficient to overcome the negative information in Mr. Mansaray's file.

## Conclusion

The motion to file a surreply (Doc. 53) is GRANTED. The motion to strike the Government's reply (Doc. 54) is DENIED. The motion to dismiss (Doc. 45) is GRANTED and

the Third Amended Complaint (Doc. 18) is DISMISSED. The motion to compel production (Doc. 40) is DISMISSED as moot.

Dated at Burlington, in the District of Vermont, this 28th day of August, 2026.

Geoffrey W. Crawford, Judge
United States District Court